UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                            :
YVONNE ORTIZ,                                               :   **MEMORANDUM DECISION**
                                         Plaintiff,         :   **AND ORDER**
                                                            :
            - against -                                     :   15 Civ. 3966 (BMC)
                                                            :
COMMISSIONER OF SOCIAL SECURITY,                            :
                                                            :
                                         Defendant.         :
----------------------------------------------------------- X

**COGAN**, District Judge.

      Plaintiff seeks review of the decision of the Acting Commissioner of Social Security, following a hearing before an Administrative Law Judge ("ALJ"), that she is not disabled for the purpose of receiving disability insurance benefits. Plaintiff contends that she is disabled because she has vestibular dysfunction (vertigo or balance problems), depression, and insomnia. Plaintiff also presents new evidence that she argues requires me to remand the case for additional findings by the ALJ. Finally, she argues that the ALJ failed to process and address plaintiff's application for Supplemental Security Income ("SSI"). I have reviewed the record to determine whether the decision of the ALJ is supported by substantial evidence. Plaintiff's problem is that, although she has a fair amount of medical evidence which might suggest disability, virtually all of it substantially post-dates her last insured date, and it raises only a bare possibility that her impairment had reached a disabling level prior to her last insured date. The ALJ's rejection of her claim is supported by substantial evidence, and I therefore grant the Commissioner's motion for judgment on the pleadings.

# BACKGROUND

Plaintiff is a middle-aged woman who alleges that in 2005 she began to suffer from dizziness, anxiety, and as a result of these physical ailments, depression. She has not worked since 2005; her date last insured was December 31, 2010. Plaintiff complains that as a result of her symptoms, she is unable to work, work out, and attend church. Her inability to complete her daily activities has led her to feel depressed.

## I.     Medical Evidence

The earliest medical record in this case is a magnetic resonance imaging ("MRI") study of plaintiff's brain from July 13, 2005. It revealed mild thickening in the sinuses and bending of the arteries. No other abnormalities were noted.

The next record appears roughly four years later. On April 7, 2009, plaintiff sought treatment at the Coney Island Clinic for generalized weakness and hair loss. On May 10, 2010, she complained of a swollen nose and swollen eyes. She was diagnosed with acute sinusitis. Those are all of the records that appear prior to plaintiff's last insured date.

On September 13, 2011, a videonystagmography ("VNG") test was performed on plaintiff. This test is used to determine the cause of a patient's dizziness and balance issues. The test results showed findings likely to be consistent with vestibular dysfunction. But "artifacts" were noted in every subset of the study. "Artifacts" is a medical term referring to blurriness or other anomalies that can make an imaging report unreliable. Dr. Marat Chaikhoutdinov, a neurologist, recommended plaintiff have balance rehabilitation but there is no indication as to whether she did.

In December, 2011, Dr. Yelena Ilina, also a neurologist, completed a report in which she indicated that plaintiff was unable to work for at least 12 months.

In March, 2012, plaintiff went back to the Coney Island Clinic complaining of dizziness and nausea with gait instability. Plaintiff indicated her dizziness had begun "more than six month[s] ago." The doctor treating plaintiff observed horizontal and vertical uncontrolled eye movements, which can cause balance problems, in both of plaintiff's eyes, and loss of hair on plaintiff's upper eyelid. Plaintiff was diagnosed with dizziness and a history of central vestibular dysfunction. Plaintiff was prescribed Meclizine, a medication used to prevent nausea and dizziness.

Plaintiff's symptoms continued, and a month later, in April, 2012, she returned to Coney Island Hospital complaining of weakness, dizziness, and a headache. She reported that the Meclizine was not helping. Plaintiff also complained of depression. She was diagnosed with dizziness and giddiness. A CT scan was performed on plaintiff's head and it did not reveal any acute findings. Instead, it revealed findings consistent with "old occipital lobe infarctions."

Plaintiff also met with Dr. Gerard Solomon in April, 2012. He examined plaintiff for complaints of depression and an inability to perform her duties. He diagnosed plaintiff with dysthymic disorder, that is, a mild, but long-term form of depression, and referred her to outpatient treatment.

In May, 2012, Dr. Ilina completed a questionnaire regarding plaintiff's functioning. Dr. Ilina first treated plaintiff in 2005, and then treated her again in 2011 and 2012. She said she could not provide an opinion regarding plaintiff's ability to do work-related activities. She assessed no limitations in plaintiff's ability to stand/walk, sit, or lift/carry; and she assessed no postural, manipulative, visual, communicative, or environmental limitations. Dr. Ilina noted

3

plaintiff's symptoms of dizziness, episodic complaints of vertigo and imbalance, as well as questionable anxiety.

A month later, plaintiff returned to the Coney Island Clinic with complaints of anxiety and episodes of dizziness. She was diagnosed with dizziness and giddiness. A CT scan of her head revealed no acute findings.

Two months later, in August, 2012, a doppler ultrasound examination of plaintiff's cerebral blood flow revealed decreased blood flow velocity in the arteries of plaintiff's brain. Two weeks later, plaintiff underwent another VNG test. This test confirmed vertigo, with impaired balance and postural instability. That same day, Dr. Chaikhoutdinov completed a questionnaire in which he advised that plaintiff was diagnosed with vestibular dysfunction in September 21, 2010, with vertiginous chronic without aura. He recommended physical and occupational therapy along with additional diagnostic tests. He checked a box on the questionnaire saying that plaintiff would be unable to work for at least twelve months.

That same month, Dr. G. Minola, a State Agency psychiatric consultant, reviewed the record and indicated that there was insufficient evidence to assess a mental impairment.

Plaintiff was treated regularly for depression associated with her health issues, between September 4, 2012 and July 11, 2013, at the Coney Island Clinic. During these sessions, plaintiff complained about poor concentration, poor appetite, sleep disturbance, depressed mood, and deep sadness.

On February 21, 2013, Dr. Chaikhoutdinov wrote a note addressed to "Social Services program" explaining that plaintiff was unable to work due to transient cerebral ischemia, vertebral artery syndrome, and vertiginous migraine headaches.

Plaintiff was evaluated by Dr. Ammaji Manyam, an internist, in August, 2013, at the Commissioner's request. Plaintiff said that she had been suffering from vestibular dysfunction, vertigo, insomnia, dizziness, and nausea since 2005. Plaintiff's gait and stance were normal and she was able to walk without difficulty. Dr. Manyam diagnosed vestibular dysfunction with insomnia, dizziness, and nausea.

Dr. Manyam completed a medical source statement about plaintiff's ability to do work-related activities. Dr. Manyam said plaintiff could continuously lift and carry up to 10 pounds and frequently lift and carry 11 to 20 pounds. Dr. Manyam indicated that he did not have an opinion about plaintiff's past limitations.

Plaintiff had another VNG test in September, 2013. The results were consistent with vestibular dysfunction. In November, 2013, Dr. Andre Strizhak, a neurologist, wrote that plaintiff's diagnoses included chronic subjective dizziness and an anxiety disorder.

## II.  New Evidence

Plaintiff has submitted new evidence in support of her claims as well. The new evidence consists of an MRI from November, 2015, which she alleges shows brain lesions, and a February, 2016 report by Dr. R.C. Krishna, a neurologist. The MRI showed no evidence of mass effect or shift of the midline structures, but showed areas of increased signal intensity as well as questionable lesions. Dr. Krishna's report stated that plaintiff "has [a] possible infection in brain . . . may have been there for many years," but her actual diagnosis was "vestibular headaches."

## III.  Procedural Background

Plaintiff filed an online application for disability insurance benefits on April 2, 2012. When she completed this application, she checked 'yes' when asked whether she also intended to apply for SSI. On April 7, 2012, the Social Security Administration issued plaintiff a letter

stating that "we talked with you about your eligibility for [SSI]. Based on that talk, we have made an informal decision that you are not eligible for SSI." Plaintiff was told she should file her application for benefits by June 6, 2012, if she still wished to do so. Plaintiff did not file an application for SSI.

Plaintiff's application for disability benefits was denied by SSA on August 9, 2012. Plaintiff appeared *pro se* at a hearing before an ALJ on November 13, 2013. The ALJ found her condition was not disabling on any date prior to December 31, 2010, the last date she was insured. Plaintiff requested Appeals Council review but the Council denied review, making the ALJ's decision the final administrative decision on plaintiff's claim for benefits.

## DISCUSSION

### I. Standard of Review

Judicial review of disability benefit determinations is governed by 42 U.S.C. §§ 421(d) and 1383(c)(3) (2006), which incorporate the standards established by 42 U.S.C. § 405(g) (2006). In relevant part, § 405(g) adopts the familiar administrative law review standard of "substantial evidence," i.e., that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive [.]" Thus, if the Commissioner's decision is supported by "substantial evidence" and there are no other legal or procedural deficiencies, then her decision must be affirmed. The Supreme Court has defined "substantial evidence" to mean "more than a mere scintilla[;][i]t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420 (1971). "In determining whether substantial evidence supports a finding of the Secretary, the court must not look at the supporting evidence in isolation, but must view it in light of the other evidence in the record that might detract from such finding, including

6

any contradictory evidence and evidence from which conflicting inferences may be drawn." Rivera v. Sullivan, 771 F. Supp. 1339, 1351 (S.D.N.Y. 1991).

**II.     Analysis**

A. Eligibility for Disability Insurance Benefits

In order to be entitled to disability insurance benefits, a claimant must establish that she became disabled prior to the expiration of her insured status. See 42 U.S.C. §§ 416(i)(3), 423(a)(1)(A), and 423(c)(1). It is well established that evidence of an impairment that reached disabling severity after the expiration of insured status cannot be the basis for the determination of entitlement to disability benefits, even though the impairment itself may have existed before the claimant's insured status expired. See Arnone v. Bowen, 882 F.2d 34, 38 (2d Cir. 1989); Vitale v. Afpel, 49 F. Supp. 2d 137, 142 (E.D.N.Y. 1999).

The fundamental problem with plaintiff's case is that while she may or may not meet the definition of disability now, her date last insured was December 31, 2010. She claimed that she became disabled on June 1, 2005, but there are virtually no medical records of treatment or diagnosis between that date and her date last insured, not even any statements from plaintiff to doctors, that show any semblance of a medically determinable impairment. The only support for a within-period disability is plaintiff's own statements in connection with her disability application, made years after the date last insured. Even the post-insured period medical records, to the extent they reference the insured period historically, do not show a severe impairment during the insured period.

Specifically, her first complaint having anything conceivable to do with her current impairments occurred in April, 2009, when she complained at an outpatient clinic of general

weakness and hair loss.[1]  But her physical examination was normal.  In May, 2010, she complained of nasal pressure and swelling and was diagnosed with acute sinusitis.  There are no other medical reports during the insured period.  There is nothing suggesting vestibular dysfunction, not even statements from plaintiff herself.

It was not until about nine months after the end of the insured period that plaintiff had a VNG test, which showed findings consistent with vestibular dysfunction.  Yet the presence of numerous artifacts substantially reduces the probative value of the test.  A repeat of the test was recommended; it was performed about a year later.  Following this test, plaintiff's symptoms clearly worsened and the results of her medical examinations were consistent with vestibular dysfunction.

Based on the administrative record before her, the ALJ concluded that "[i]t was not until significantly after December 31, 2010, the date claimant was last insured for benefits, that there is medical evidence of an impairment."  She further noted that although plaintiff had received the artifact-laden MRI in September, 2011, "she sought no further treatment for her complaints of dizziness and nausea … until March, 2012."  With regard to her allegation of a psychiatric contributor, the ALJ similarly found that "there is no medical evidence of a psychiatric condition until well after December 31, 2010 …."  The ALJ therefore found that plaintiff did not qualify for disability benefits.

Plaintiff's main argument is that the ALJ failed to properly develop the record to explore gaps in the record of plaintiff's disability.  Plaintiff contends the ALJ had a special obligation to do so in light of plaintiff's *pro se* status at the time of the hearing.  See Rosa v. Callahan, 168

---

[1] The ALJ cited to Exhibit 1F at page 1, an April 2009 report of examination, as the first time plaintiff reported dizziness and nausea.  I do not see that in the exhibit.

F.3d 72, 79 (2d Cir. 1999). Plaintiff argues that the ALJ's failure to seek additional records from Drs. Chaikhoutdinov and Ilina has resulted in the omission of evidence that would show plaintiff was disabled prior to her last insured date.

However, plaintiff, who is now represented by counsel, has not given me any specific examples of what records were missing or overlooked by the ALJ. Further, at the hearing, the ALJ explicitly asked plaintiff to confirm that all relevant medical records had been provided to the ALJ. The ALJ specifically asked about records from Drs. Chaikhoutdinov and Ilina.

Plaintiff points to the fact that Dr. Chaikhoutdinov, as noted above, indicated that plaintiff had an onset date for vestibular dysfunction of September 21, 2010. The ALJ expressly considered that opinion and properly determined to place no weight on it as there is not a single document in the record that would support it. The ALJ is not obligated to go back to Dr. Chaikhoutidnov after she determined that no medical evidence could support his finding. The ALJ reviewed all of plaintiff's records prior to her last insured date, which included an MRI from 2005, a CT scan from 2010, and records from the Coney Island Hospital.

Plaintiff makes a similar argument with respect to Dr. Ilina, who noted in a December, 2011, statement that plaintiff was unable to work. Aside from a statement on an issue reserved for the ALJ, it was not supported by any medical evidence.

Plaintiff incorrectly claims that under SSA regulations, when the ALJ rejected the findings of plaintiff's treating physicians, she had an obligation to direct plaintiff to obtain a more detailed statement from them. However, under SSA regulations that were promulgated prior to the ALJ's decision, an ALJ may, but is not obligated to, recontact a treating physician. See 20 C.F.R. § 404.1520b. Aside from this note, and plaintiff's own complaints, there was

nothing in the records that could have supported a finding that plaintiff was suffering from vestibular dysfunction prior to her last insured date.

    B.  New Medical Evidence Presented by Plaintiff

A remand may be justified if the claimant produces "new evidence which is material" and if "there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); see also Pollard v. Halter, 377 F.3d 183, 194 (2d Cir. 2004). The statute has been interpreted to impose a three-prong standard on claimants. First, plaintiff must show that the proffered evidence is "new and not merely cumulative of what is already in the record." Tirado v. Bowen, 842 F.2d 595, 597 (2d Cir. 1988) (citing Szubak v. Sec'y of Health & Human Servs., 745 F.2d 831, 833 (3d Cir. 1984)). Second, the evidence must be material. For evidence to be material, there must be a "reasonable possibility that the new evidence would have influenced the Secretary to decide claimant's application differently." Id. When a diagnosis emerges after the close of administrative proceedings that sheds "considerable new light on the seriousness of a claimant's condition," evidence of that diagnosis is material and justifies remand. See Lisa v. Sec'y of Dep't. of Health & Human Services of U.S., 940 F.2d 40, 44 (2d Cir. 1991). Plaintiff bears the burden of establishing materiality. See Bowen v. Yuckert, 482 U.S. 137, 146 n. 5, 107 S. Ct. 2287, 2294 (1987). Finally, there must be good cause for failure to present the evidence earlier. See Tirado, 842 F.2d at 597.

Defendant does not contest that the evidence submitted by plaintiff is new. Rather, she correctly argues it is not material. First, the MRI of plaintiff from November 2015 only shows plaintiff's medical condition at the time the MRI was undertaken. It does not shed any light on plaintiff's medical condition prior to her last insured date, almost five years earlier.

Second, the note from Dr. Krishna stating that plaintiff has a possible brain infection which "may have been there for many years," is also not material. The "diagnosis" of Dr. Krishna is that plaintiff suffers from "vascular headaches." The comment about the "possible" brain infection is included in the recommendation section and is not supported by any additional treatment notes. Dr. Krishna's note consists of vague speculation that would not have changed the ALJ's decision because it does not shed new light on claimant's condition. Instead, it provides an alternative theory about why plaintiff has been suffering from balance and gait problems. There is nothing about Dr. Krishna's statement that would have influenced the ALJ to decide claimant's benefits eligibility differently.

    C. <u>Eligibility for Supplemental Security Income</u>

Plaintiff's argument that the ALJ improperly ignored her claim for SSI benefits overlooks the record in this case. Plaintiff points to her online disability application from April 2, 2012, where she affirmatively stated "yes" when asked if she intended to apply for SSI benefits. Plaintiff argues that this internet claim constitutes a protective filing under SSA policy. See Social Security's Operations Manual GN § 204.010(B)(2). If the SSA did not inform plaintiff of her need to file a formal application within 60 days of the protective filing, the protective lead would stay open. See id. Plaintiff contends the ALJ had an obligation to ask her about SSI when she inquired about other public assistance plaintiff was receiving.

The ALJ had no obligation to inquire with plaintiff about her intention to apply for SSI benefits. Plaintiff's protective filing did not remain in place because on April 7, 2012, a close-out notice was issued.[2] The close-out notice effectively stated that plaintiff had spoken with a

---

[2] This notice is not included in the administrative record, but was attached as an exhibit to defendant's reply brief.

11

SSA representative about her eligibility for SSI and was informally determined to be not eligible for SSI because she had not filed an application for benefits. The notice further informed plaintiff that she could file a claim for SSI, but had to do so by June 6, 2012, within 60 days of receipt of the notice.

This close-out notice is further corroborated by the April 7, 2012, Application Summary for Disability Insurance Benefits. This document is a "summary of [plaintiff's] statements" made when she completed her application for disability benefits. The summary states that "I do not want to file for SSI." Although plaintiff claims she did not endorse this statement as her own, it certainly corroborates the close-out notice.[3]

The ALJ had no independent obligation to ask plaintiff about her plans to file for SSI. Although an ALJ must assist a *pro se* claimant in developing the facts relevant to her case, such as obtaining all relevant medical records, she is not required to ask plaintiff whether she intends to file a claim for a certain type of benefits after plaintiff indicated she does not want to obtain those benefits. Quite simply, an ALJ is not required to second guess a claimant's decision not to seek a certain type of benefits.

Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and the Clerk is directed to enter judgment dismissing the complaint.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
         June 13, 2016

---

[3] If plaintiff did not make this statement, she could have objected to it at the hearing before the ALJ. The ALJ specifically asked plaintiff if she had an opportunity to review the record before beginning the hearing.